**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DaVINCI EDITRICE S.R.L., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-3415 |
| | § | |
| ZIKO GAMES, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

I.    **Introduction**

Human creativity takes many forms.  Devising games for people to play, including card games, is one of them.  Card games have been with us for centuries.[1]  Despite the recent seeming dominance of electronic games with virtually present players, games using actual cards and physically present players endure, and new games continue to appear.  As with many forms of creativity, new games lead to disputes over who is entitled to exploit them.  This case is one of those disputes.

The plaintiff, DaVinci Editrice S.R.L. ("DaVinci"), alleges that the defendants, ZiKo Games, LLC ("ZiKo") and Yoka Games ("Yoka"), infringed the copyright DaVinci holds in a card game called *Bang!*.  The parties ask this judge—not known for expertise or experience in playing cards

---

[1] Playing cards have been in use since as early as the 9th century in Imperial China.  *See* W.H. WILKINSON, *CHINESE ORIGIN OF PLAYING CARDS*, A8 AMERICAN ANTHROPOLOGIST 61, 64 (2009).  Card games are popular throughout the world for both recreation and gambling.  Russell, Morgan and Company, which eventually became the United States Playing Card Company, the largest producer and distributor of playing cards in the United States, began manufacturing playing cards in 1881.  TOM DAWSON & JUDY DAWSON, THE HOCHMAN ENCYCLOPEDIA OF AMERICAN PLAYING CARDS (U.S. Game Systems Inc., 2000).  Role-playing card games developed in the late 20th century and have grown in popularity.  There are currently 21 role-playing card games available for purchase on Amazon.com.

—to decide whether the plaintiff's copyright in its role-playing game, with characters and themes from "spaghetti Westerns," is infringed by the defendants' role-playing card game, which uses essentially the same rules, methods of play, and roles but substitutes characters and themes from ancient China.  DaVinci sued Yoka and its United States distributor, ZiKo, alleging violations of the Copyright Act of 1976 and of Texas unfair competition law.  DaVinci alleges that the defendants' game, *Legends of the Three Kingdoms* ("*LOTK*"), improperly copied protected features of its game, *Bang!*.

The defendants have moved to dismiss DaVinci's complaint for failure to state a claim on which relief can be granted.  (Docket Entry No. 25).  DaVinci has responded, and Yoka and ZiKo have replied.  (Docket Entry Nos. 30, 34).  DaVinci has moved for a preliminary injunction under Federal Rule of Civil Procedure 65 and 17 U.S.C § 502, enjoining Yoka and ZiKo's sale of their allegedly infringing game, *LOTK*.  (Docket Entry No. 2).  Yoka and ZiKo have responded, and DaVinci has replied.  (Docket Entry Nos. 26, 29).

Based on the pleadings, the motions and responses, the parties' submissions, and the applicable law, this court grants in part and denies in part Yoka and ZiKo's motion to dismiss and denies DaVinci's motion for preliminary injunction.  A status and scheduling conference on the remaining claims is set for **September 5, 2014**, at 5:00 p.m. in Courtroom 11-B.

The reasons for these rulings are explained in detail below.

## II.    Background

### A.    DaVinci and *Bang!*

DaVinci is an Italian company formed in 2001.  (Complaint, Docket Entry No. 1, ¶¶ 2, 11).  On July 10, 2002, DaVinci published a  role-playing card game featuring Wild-West themes, called

*Bang!*.  (*Id.* ¶ 12, 13).  The game achieved praise from critics and commercial success.  It won the Origins Award for "Best Traditional Card Game of 2003" and "Best Graphic Design of a Card Game or Expansion of 2003."  (*Id.* ¶ 14).  DaVinci has sold over 670,000 copies of *Bang!*, including an estimated 176,000 copies in the United States.  (*Id.* ¶ 19).

Describing the game in the form of an opinion overstates its complexities.  Players in *Bang!* each take on a character identity within one of four roles: "Sheriff," "Deputy," "Outlaw," or "Renegade."  Each role has a different objective in the game.  The Sheriff tries to stay alive until the Outlaws and the Renegade are killed.  The Deputies try to protect the Sheriff.  The Outlaws' goal is to kill the Sheriff, though they can earn rewards for killing each other as well.  The Renegade's goal is to be the last player alive.  Each player draws a card that assigns a role.  The Sheriff  reveals his role at the outset; the other players keep their assigned roles secret.  The number of players in each role depends on the number of people playing the game.  (*Id.* ¶¶ 20–26).

Each player is also dealt a character card.  The character cards have pictures and names based on familiar Wild-West figures, such as "Calamity Janet" and "Willy the Kid."  Each character has an assigned set of capabilities and a maximum number of "life points."  The back of each character card shows bullets to represent the life points.  The maximum number of life points or bullets any player can have is five.  Life points determine whether a player remains active as the game progresses. When one player uses a weapon card and "hits" another player, the attacked player loses a life point.  When a player is out of life points, that player is eliminated from the game.  To keep track of how many life points a player has remaining, each player uses an unselected character card turned face down, which causes the pictures of the bullets to be face-up. The player then moves his character card (which is face-up to show the character's identity) over the picture of the bullets so

that only the player's number of bullets shows.  The number of bullets a player has left also determines how many cards the player may hold in his hand.  For example, if a player has only two bullets remaining, he may only hold two cards in his hand.  If he holds more than two cards in his hand, he must discard cards until he holds only two.  (*Id.* ¶¶ 27–28, 30–31; Corbelli Decl., Docket Entry No. 3-1, ¶ 32).

Players sit around a table.  The distance between players at the table impacts the game. (Compl. ¶ 32).  Different weapons have different ranges at which they can be used to attack other players.  (*Id.* ¶ 77).  The Sheriff plays first.  The game proceeds counterclockwise around the table, with each player drawing two cards, playing as many cards as desired, and discarding if that player finishes the turn with more cards than life points remaining.  (*Id.* ¶ 42).

There are three types of playing, or action, cards.  Brown-bordered action cards are played and immediately discarded.  Blue-bordered "mount" cards are a type of action card that increases the distance between players for the purpose of launching or avoiding attack.  A mount card is laid face up in front of the player and has lasting effect, which means that the player holding the card can take advantage of whatever characteristic the card grants for repeated turns.  (Corbelli Decl. ¶¶ 37, 39).  For example, playing the "Cavallo" ("Horse") card permanently increases the distance that other players need to hit the player holding the card.  (*Id.* ¶ 40).  Blue-bordered "weapon" cards are laid face up in front of the player and remain until replaced with another weapon card.[2]  (Compl. ¶ 43).  The brown-bordered action cards include "Bang!" (which are played  to reduce another player's bullets), "Mancato!" ("Missed!") (which is played in response to a "Bang!" card to avoid

_____

[2] The term "action card" encompasses mount cards and weapon cards as well.

4

losing a bullet), and "Birra" ("Beer") (which a player can use to avoid elimination).  (*Id.* ¶¶ 40–41,

44, 50; Oleksiuk Decl., Docket Entry No. 25-3, ¶¶ 20–22). The brown-bordered cards fit the Italian

Wild-West motif, with labels such as "Saloon," "Diligenza" ("Stagecoach"), "Wells Fargo,"

"Mistress," "Indiani!" ("Injuns!"), and "Duello" ("Duel").  Each card calls for a specific action the

player must perform, such as discarding a Bang! card, revealing cards in a player's hand, or passing

a card to another player.  (Compl. ¶ 45; Oleksiuk Decl. ¶¶ 26, 29, 28, 31).

Blue-bordered mount cards also have western themes, including "Jail," "Dynamite,"

"Barrel," "Horse," and "Appaloosa."  These cards increase or reduce the distance between the

players, which in turn determines whether an attack with a given weapon will succeed.  (Compl. ¶¶

47–49).  The weapon cards also evoke the Wild West, with Colt .45 as the default and others such

as Remington, Schofield, Rev. Carabine, or Winchester.  (*Id.* ¶¶ 34, 40).

The game ends when playing the action cards leads to either the Sheriff being killed, so that

either the Renegade or the Outlaws win, or the Outlaws and the Renegade being killed, so that the

Sheriff and his Deputies win.  (*Id.* ¶ 56).

*Bang!* is now in its third edition and a fourth is about to issue.  The first three are registered

with the United States Copyright Office and DaVinci has submitted the fourth edition registration

application, fee, and the material proposed for copyright to the Register of Copyrights.  (*Id.* ¶ 17).[3]

---

[3]  The first edition is registered under Registration Number VA 1-864-967.  The second and third editions are registered with Registration Numbers VA 1-880-069 and VA 1-879-895, respectively.

**B.     Yoka, ZiKo, and *Legend of the Three Kingdoms***

Yoka, based in the People's Republic of China, sells the "ancient Chinese" themed role-playing card game *Legend of the Three Kingdoms* (*LOTK*).  (*Id.* ¶¶ 4, 57).  Yoka sells and distributes *LOTK* in the United States through its Texas-based distributor ZiKo.  (*Id.* ¶ 59).  Due to the relative recency of Yoka's entry into the U.S. market, there is no historical data available for U.S. sales of *LOTK*.  (Docket Entries No. 3 at 22–23, 26 at 19).

The parties agree that *Bang!* and *LOTK* have nearly identical rules for playing the game.  The setting, artwork, and written instructions are substantially different.  *LOTK* is "re-set in ancient China instead of the wild-west."  (Compl. ¶ 62).  The "ancient Chinese" themed roles in *LOTK* (the Monarch, Minister, Rebel, and Turncoat) "fulfill the same role[s]" as the Sheriff, Deputy, Outlaw, and Renegade in *Bang!*.  (*Id.* ¶ 63).  "The winning conditions are the same" in both games.  (*Id.* ¶ 64).  "Only the Monarch's identity is known to the other players."  (*Id.* ¶ 65).  The procedure for distributing Ministers, Rebels, and Turncoats follows "the same manner as in *Bang!* based on the number of players."  (*Id.* ¶ 66).  In both games, "each player is dealt a character identity . . . which provides a specific ability and determines the number of life points for the player."  (*Id.* ¶ 67).  "As in [the Sheriff in] *Bang!*, the Monarch starts the game with one more life point than shown on his character card."  (*Id.* ¶ 68.)  Life points are displayed on cards in both games*, id.* ¶ 69, but instead of showing them as bullets, *LOTK* shows the life points as glowing, yin-yang shaped symbols.  Both games show the life points on cards, but *Bang!* places them on the back of character cards, while *LOTK* has separate life-point cards.  (Oleksiuk Decl. ¶ 50).

*LOTK* features "Hero cards," equivalent to *Bang!*'s character cards.  *LOTK* heroes "Lu Bu, Zhao Yun, Ma Chao, Zhou Yu, Zhang Fei, Zhang Liao, and Huang Gai" . . . "have the same abilities

[game functions] as the *Bang!* characters Slab the Killer, Calamity Janet, Rose Doolan, Pixie Pete, Willy the Kid, Jesse Jones, and Chuck Wengam."  (Compl. ¶ 70.)  *LOTK* expresses these same characters but uses names and characters evocative of ancient China.  These seven characters have the same or similar capabilities and the same number of life points in both games.  (*Id.*).

Action cards in *LOTK* are alleged to "operate" the same ways as the action cards in *Bang!*, using words and artwork reflecting ancient China rather than the Wild West.  "Strike cards operate the same way as a Bang! card.  Peach cards operate the same way as Beer [*Birra*] cards.  Dodge! cards operate identically to Missed! [*Mancato!*] cards."  (*Id.* ¶ 74.)  "Basic cards operate the same way as *Bang!*'s brown bordered cards.  Scroll cards operate as the blue bordered cards.  Equipment and Weapon cards in operate the same way as the Weapon cards in *Bang!*."  (*Id.* ¶ 75.)

DaVinci included with its brief in support of its preliminary injunction application a chart identifying 64 similarities between the two games.  (Docket Entry No. 3-7).  ZiKo and Yoka responded with a chart of dissimilarities.  (Oleksiuk Decl. ¶ 51).

These alleged similarities fall into four general categories: 1) the overall concept and physical layout of the games; 2) the roles and winning conditions of each role; 3) characters and their abilities; and 4) rules of play.

Both *Bang!* and *LOTK* are turn-based card games in which most of the players have hidden roles.  Both games have identical mechanisms and rules for one player to attack other players or defend against attack.  Each successful attack reduces a player's life points.  The physical positions of the players around a table is the same.  The "Monarch," "Minister," "Rebel," and "Turncoat" roles from *LOTK* correspond to the Sheriff, Deputy, Outlaw, and Renegade roles of *Bang!*.  These roles are functionally identical and subject to the same rules.  As the names reflect, the *LOTK* roles

are named to invoke ancient Chinese figures; the *Bang!* roles are named to invoke the Wild West.

The rules of play are nearly identical.  Both games use action cards, which are laid face up in front of the players and have a lasting effect.  Both games also use mount cards, a type of action card that increases the distance between players for the purposes of launching and avoiding attack. Weapon cards are the third form of action card common to both games.  Weapon cards allow players to attack one another at a specified range based on the type of weapon.  Both games use action cards the same way.

### C.    Procedural Background

In November 2013, DaVinci filed the complaint and application for a preliminary injunction preventing the continued sale and offering for sale of *LOTK*.  (Docket Entry Nos. 1, 2).  Yoka and ZiKo moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and opposed the preliminary injunction, arguing that DaVinci has not copied elements of *Bang!* that are protectable by copyright, and that the unfair competition claim is preempted by federal law.  (Docket Entry No. 25).  The parties have extensively briefed the issues and have submitted the games to permit a side-by-side comparison.  This court heard oral argument on the motions.

The critical issues for both the motion to dismiss and the application for a preliminary injunction is whether the undisputed extensive similarities between *Bang!* and *LOTK* are in elements that qualify as protected expression under federal copyright law, and whether the similarities are sufficient to state a claim for infringement and state-law unfair competition and to support a preliminary injunction.  The arguments and responses are analyzed below.

### III.   The Motion to Dismiss

### A.      The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b) (6).  In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir.2008).  The Supreme Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir.1996).  "[C]ourts may also consider matters of which they may take judicial notice."  *Id.* at 1017–18.  A court may, however, "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation omitted).  The court may consider such extrinsic materials as matters of public record without converting the motion into one seeking summary judgment.  In addressing a motion to dismiss in copyright cases, the court routinely considers the parties' charts and other descriptions of what a side-by-side comparison of the two works reveals.

9

### B.     The Copyright Infringement Claim

Section 102(a) of the Copyright Act provides copyright protection to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102.  Section 102(b) explicitly limits this protection:  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  *Id.*

"To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'"  *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quoting *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004)).  "In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid."  *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir.1990).  "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004) (citation omitted). "[N]ot all copying is legally actionable.  To support a claim for copyright infringement, the copy must bear a substantial similarity to the protected aspects of the original."  *Peel & Co. v. The Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001).  This involves a determination of whether there are articulable similarities between plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works.  The court must "determine the scope of copyright protection before

works are considered 'as a whole.'" *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475–76 (9th Cir. 1992)).

Copyright law does not protect an idea. Only "the expression of an idea" is protected. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). A party claiming infringement may place "'no reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer*, 35 F.3d at 1446 (quoting *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)).

### C.    Protected Expression

#### 1.    The Parties' Contentions

It is undisputed that DaVinci has a valid copyright in *Bang!*. Yoka and ZiKo argue that the elements in *Bang!* that later appeared in *LOTK* are not, as DaVinci claims, protectable. Yoka and ZiKo argue that while the two games have virtually identical or substantially similar elements, the challenged elements are either systems, methods, and procedures that are not given copyright protection, or are not substantially similar. "DaVinci cannot state a claim of copyright infringement because the allegedly copied elements are either inherent in the idea of a role-playing card game, a method of operation or game play, and/or a part of the game idea and rule[s] of *Bang!* not protectable under the Copyright Act. Moreover, *Bang!* and *LOTK* have substantial qualitative differences in expression—the mood, settings, characters, artwork are fundamentally different. The claim should be dismissed." (Docket Entry No. 25 at 21).

DaVinci responds that it has alleged substantial similarities between protectable elements of *Bang!* and corresponding features of *LOTK*, that the defendants have "captured the 'total concept and feel'" of *Bang!*, and that the court should conduct the analysis based on a "combined

consideration of protected elements, not any single element in isolation." (Docket Entry No. 30 at 5 (citing *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir. 1977)).

### 2.    The Case Law on Protectable Elements in Games

Historically, the rules of games have not been protected by copyright. *See*, *e.g.*, *Whist Club v. Foster*, 42 F.2d 782, 782 (S.D.N.Y. 1929) ("In the conventional laws or rules of a game, as distinguished from the forms or modes of expression in which they may be state[d], there can be no literary property susceptible of copyright."). "[G]ame mechanics and the rules are not entitled to protection, but courts have found expressive elements copyrightable, including game labels, design of game boards, playing cards and graphical works." *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 404 (D. N.J. 2012) (citations omitted); *see also Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) ("copyright protection extends only to the artistic aspects, but not the mechanical or utilitarian features, of a protected work.").

This general rule is consistent with the decision in *Baker v. Selden*, 101 U.S. 99 (1879), in which the Supreme Court ruled that a particular system of bookkeeping was not copyrightable. The language and illustrations that the plaintiff had used to explain his system were copyrightable, but they did not protect the system itself from use by other parties. *Id.* at 103. *Selden* held that a system's method of operation is not protectable by copyright. The Copyright Office apparently applied this view to game rules. The December 2011 fact sheet for Copyright Registration of Games states:

> Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it. Nor does copyright protect any idea, system, method, device, or trademark material involved in

> developing, merchandising, or playing a game.  Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles.  Copyright protects only the particular manner of an author's expression in literary, artistic, or musical form.

U.S. COPYRIGHT OFFICE, FL-108, COPYRIGHT REGISTRATION OF GAMES (2011).

The defendants have cited several cases involving board games and card games to support their assertion that game rules and game mechanics are not entitled to copyright protection.  In *Chamberlain v. Uris Sales Corporation*, 56 F. Supp. 987 (S.D.N.Y. 1944), the court held that the plaintiff could not rely on copyright protection for the rules of the game "Acy-Ducy," a four-player variation of backgammon.  The court found that the plaintiff's material lacked the originality necessary for copyright protection, noting that "it is very doubtful if rules of a game can, in any event, be copyrightable subject matter."  *Id.* at 988 (citations omitted).  In *Freedman v. Grolier Enteprises, Inc.*, 1973 WL 19914 (S.D.N.Y. June 30, 1973), the court held that "[t]he placing of single numeral point count values beneath the suit symbols on honor cards in bridge decks [was] not copyrightable."  *Id.* at *2.  The court noted that "[w]hen an idea is so restrictive that it necessarily requires a particular form of expression, that is, when the idea and its expression are functionally inseparable, to permit the copyrighting of the expression would be to grant the copyright owner a monopoly of the idea."  *Id*. at *3.  Courts have ruled that the limited opportunity for expression significantly curtails the scope of copyrightable material in traditional card games.  *See Russell v. Ne. Publ'g Co.*, 7 F. Supp. 571, 572 (D. Mass. 1934) ("[A] complainant can acquire no exclusive rights in the particular distribution of the fifty-two cards, in the problem of play or the principles of contract bridge applicable to its solution. The most that can be claimed is protection against the copying of the language used in presenting the problem.").  But these constraints are much less

apparent in newer forms of card games not subject to the limits of a 52-card deck.  More recent cases involving newer forms of card games and electronic games indicate that the protection for game content in these contexts may be more extensive than the earlier card-game cases suggest.

Yoka and ZiKo rely on *Incredible Technologies, Inc. v. Virtual Technologies, Inc.*, 400 F.3d 1007 (7th Cir. 2005), in which the Seventh Circuit held that copying an arcade golf game's control panel and instructional guide did not constitute copyright infringement because the copied materials were functional elements of the allegedly infringed game.  *Id*. at 1015.  But the Seventh Circuit has also held that "sequences" and "arrangements" in games can "provide something 'new or additional over the idea'" and are entitled to copyright protection.  *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982) (citing *Goodson-Todman Enters., Ltd. v. Kellogg Co.*, 513 F.2d 913 (9th Cir. 1975).

*Tetris Holding* highlights a key problem underlying copyright disputes over games: "almost all expressive elements of a game are related in some way to the rules and functions of game play." 863 F. Supp. 2d at 405.  That case examined similarities between *Tetris*, "a facially simple puzzle game in which the player is tasked with creating complete horizontal lines along the bottom of the playing field by fitting several types of geometric block pieces (called tetrominos) together," and *Mino*, a *Tetris*-inspired game that could be described in the same fashion.  *Id.* at 396.  The court found "the dimensions of the playing field, the display of 'garbage' lines, the appearance of 'ghost' or shadow pieces, the display of the next piece to fall, the change in color of the pieces when they lock with the accumulated pieces, and the appearance of squares automatically filling in the game board when the game is over" to be protectable, despite the fact that all these elements were related to game functionality.  *Id.* at 413.  The court emphasized that merely because rules, standing alone,

14

are not copyrightable "does not mean, and cannot mean, that *any and all expression* related to a game rule or game function is unprotect[a]ble." *Id.* at 404–05 (emphasis in original). Yoka and ZiKo may have infringed DaVinci's copyright in *Bang!*, even though the game labels and artistic features of the playing cards in *LOTK* are not similar.

### 3.    Analysis

The case law makes clear that the manner in which DaVinci expresses the rules of *Bang!* is protectable. The text of the instructions for playing the game and the text on the cards themselves are copyrightable. But DaVinci does not allege, and the side-by-side comparison does not reveal, similarities between the text of the rule instructions and the card content in *Bang!* and in *LOTK*. The rules are not otherwise fixed in a tangible medium of expression. This precludes relief based on alleged similarities between the rules of play of the two games. The similar uses of life points, distance between players, action cards, and rewards and punishments do not constitute actionable copying.

Characters can be protected by copyright, although "stock" characters (stereotypical archetypes that audiences may readily recognize) are not entitled to protection. *See Gaiman v. McFarlane*, 360 F.3d 644, 659–60 (7th Cir. 2004); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 821–22 (9th Cir. 2002) ("[S]tock characters are not protect[a]ble by ©"); *Williams*, 84 F.3d at 588; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986). Copyright law protects "not only the [character's] visual resemblance but also the totality of the character's attributes and traits." *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983) (citations omitted). In *Nichols v. Universal Pictures Corporation*, 45 F.2d 119, 121 (2d Cir. 1930), Judge Learned Hand offered a useful commentary

15

on the extent of copyright protection for characters:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast as a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.  These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species.  It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.

It is undisputed that the corresponding characters in the two games have substantially similar capabilities.  Each character card in both games has a name, picture, and a description of the character's capabilities and life points.  The defendants allegedly copied these capabilities and life points, simply changing the names and artwork.  The questions are whether these character elements are protected and whether translating the *Bang!* characters from a Wild West to an ancient China theme infringes that protection.

DaVinci alleges infringement because "[*LOTK*]'s characters Lu Bu, Zhao Yun, Ma Chao, Zhou Yu, Zhang Fei, Zhang Liao, and Huang Gai have the same capabilities as the *Bang!* characters Slab the Killer, Calamity Janet, Rose Doolan, Pixie Pete, Willy the Kid, Jesse Jones, and Chuck Wengam respectively."  (Corbelli Decl. ¶ 57).  Yoka and ZiKo argue that these common capabilities do not give rise to a copyright claim for two reasons: 1) character capabilities are part of the game's rules of play, which are not protected; and 2) the Wild-West-themed artwork on the character cards in *Bang!* is very different from the ancient-China-themed artwork on the character cards in *LOTK*. (Docket Entry No. 25 at 7).

The characters of *Bang!* are distinctly marked and have been assigned a specific set of

16

abilities.  They are sufficiently defined and described to be entitled to copyright protection.  *See Gaiman*, 360 F.3d at 660.  The question is whether *LOTK*'s characters, translated from the Wild West to ancient China, are substantially similar to the corresponding characters in *Bang!*.

The capabilities are part of each character's "attributes and traits" and are protectable with the characters' names and visual depictions.  *See Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741 (N.D. Ill. 1983) (holding that the "literary" works in a PAC-MAN game could be infringed  without infringing the game's audiovisual component).  Even though the specific capabilities that a character may have or use are in themselves an unprotectable part of the rules of play, these specific capabilities are relevant to determining whether the protectable expression of the characters in the two games are substantially similar.  *Id.; see*, *e.g.*, *Capcom U.S.A., Inc. v. Data East Corp.*, 1994 WL 1751482 (N.D. Cal. Mar. 16, 1994); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309–10 (S.D.N.Y. 1999) ("In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." (citations omitted)); *Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd.*, 697 F. Supp. 1136, 1140 (E.D. Cal. 1987) (Considering the characters' "developed personalities and particular ways of interacting with one another and their environment.").

The *Capcom* opinion is instructive.  In that case, the plaintiff's video game, *Street Fighter II*, contained "highly individualized characters, each with a distinctive fighting style, appearance and special magic moves and combination attacks."  *Id*. at *9.  The plaintiff in *Capcom* alleged that the defendant's video game "replicate[d] the distinctive fighting style, appearance and special moves of many of the *Street Fighter II* characters."  *Id*.  The court found that three characters and five

17

special fighting moves in *Street Fighter II* were protectable.  The side-by-side comparison of the plaintiff's video game with the allegedly infringing video game led the court to eliminate two characters "from the core of protectable expression" that was infringed because those characters had very different physical features.  *Id.* at *12.  The court also noted that the fighting styles of these two characters and the allegedly infringing characters were "dissimilar with the exception of the two common moves."  *Id.*

The character elements here are similar to the character elements that were found protectable in *Capcom*, and distinguishable from those that were unprotectable.  The seven characters from *LOTK* have capabilities and life points that are identical or substantially similar to those of the corresponding seven characters in *Bang!*.  Some of the characters that were alleged to be protectable in *Capcom* were not because they were stock characters, and not original.  Some of the special moves that were alleged to be protected in *Capcom* were not because they were based on real wrestling moves.  The *Bang!* characters are derived from Wild-West models but are original expressions, including their visual characteristics and their capabilities within the game.  Given the similarities between the attributes of the characters in *Bang!* and in *LOTK*, a reasonable factfinder could conclude that the characters of the two games are substantially similar despite the transposition and translation from the Wild-West theme of *Bang!* to the ancient China theme of *LOTK*.

A related issue is whether the players' roles are protectable.  The players in both games play virtually identical roles.  Yoka and ZiKo argue that the players' roles are an unprotectable rule of play.  The four specific roles that DaVinci chose for its game define how the players interact and are fixed in a tangible medium of expression.  Under the case law, such roles and their expression

18

are not merely rules that prescribe *what* the players may do; the roles and their expression also describe *how* the players may do it.  If the roles describe the content of the players' interactions in ways that are "sufficiently original or creative to merit © protection," players' roles can be protectable.  *Incredible Techs.*, 400 F.3d at 1013.

A recent district court case from the Western District of Washington is helpful here.  In *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012), the plaintiff video-game producer alleged that the defendants had infringed by copying the plaintiff's game.  *Spry Fox* involved a video game called *Triple Town* and an allegedly infringing game, *Yeti Town*.  The objective in both games was to score points by developing a city through a process of matching three game pieces together.  Each game takes place in a six-by-six grid.  The player places three objects in connected squares of the grid to create a new object that advances the player one step up in the game's hierarchy.  In *Triple Town*, three units of grass combined to form a bush, three bushes made a tree, three trees made a hut, and so on.  *Yeti Town* followed the same progression, but used saplings, trees, tents, and cabins for the corresponding objects in *Triple Town*.  Both games included dialogue boxes that explained game concepts.  These boxes used similar but not identical phrases. Each game included antagonistic characters that slowed the players' progress.  In *Triple Town*, the antagonist was a bear; in *Yeti Town*, the antagonist was a yeti.  *Id.* at *1.  As in the present case, the game rules were essentially identical.  The dispute was similar to the issue here:  what is protectable element expression and what is not, including because it is an unprotectable game rule?

The court in *Spry Fox* held that the game's "object hierarchy that progresse[d] from grass to bushes to trees to houses and beyond" was a copyrightable element of expression.  The court denied the defendants' motion to dismiss despite significant visual differences between the two

games, noting that "a court must focus on what is similar, not what is different, when comparing two works." *Id*.

The players' roles in *Bang!* are analogous to the object hierarchy in *Spry Fox*.  The roles are distinguishable from game rules such as requirements for the order in which players move or for scoring. Game rules that set the order for players to move or a scoring system are not protected.  By contrast, copyright does protect the "sequence of [a work's] events [and] the development of the interplay of its characters."  *Miller v. Universal City Studios*, 650 F.2d 1365, 1368 (5th Cir. 1981). The descriptions of the players' roles in *Bang!* establish the sequence of the game's events and the interplay of the characters.  The roles dictate how players interact with one another.  The descriptions of the roles express the underlying creative idea that is the essence of *Bang!*.  Just as the progression from grass to bush to tree to hut was protectable expression in *Spry Fox*, so the interplay between the Sheriff, Deputies, Outlaws, and Renegades is protectable expression here.

This case is distinguishable from *Incredible Technologies*.  In that case, the plaintiff's game, *Golden Tee*, used a trackball that players rolled back and forth to simulate a golf swing.  400 F.3d at 1010.  The game also provided "shot shaping" choices, giving players options to "simulate a straight shot, a fade, a slice, a draw, a hook, etc. by the direction in which the trackball is rolled back and pushed forward."  *Id.*  The game included visual cues, such as "arrows pointing to the direction a golf ball will fly."  *Id.* at 1012.  The elements at issue in *Golden Tee* were not sufficiently original or creative to warrant copyright protection.  *Id*. at 1013.  *Incredible Technologies* is based on golf, a real sport with a well-established form of game play.  That is important because the expressive elements in a golf arcade game are necessarily limited by golf itself.  There is a limited number of ways for the game designer to show a golfer, a course, a swing, and the ultimate goal: putting the

ball in the hole.  Such limits do not apply to role-playing games like *Bang!*.  There are nearly infinite ways of expressing the concepts of player elimination or a contest between authorities and their opponents.  Instead of choosing a different manner of expressing these concepts, the defendants copied into *LOTK* protectable elements of DaVinci's original and creative expression in *Bang!*.

The artistic depictions of the Monarch, Minister, Rebel, and Turncoat roles in *LOTK* clearly differ visually from the depictions of the corresponding roles in *Bang!*.  But the characteristics and manner in which the characters interact, not merely the names and pictures used to depict them, are creative and expressive elements in a role-playing game and are protectable.  The roles and interplay among the characters in *LOTK* resemble those in *Bang!* closely enough to give rise to a plausible infringement claim and defeat the motion to dismiss.

As a role-playing game, *Bang!* differs from traditional games that have received little or no © protection.  Role-playing games are not necessarily played with a 52-card deck, with its limited possibilities for creative expression or interactive variety.  Role-playing games are also far less limited than most games by mechanical processes such as the roll of dice or the pattern of a game board.  The driving forces behind the experience of a role-playing game are individual decisions and the interactions among the players.  The creative methods a game designer uses to define and shape that experience are the expressive elements that are protectable under © law.  The impact that artwork has on the "total concept and feel" of a role-playing game has less relative significance than the manner of game play that the creator defines through expressive choices such as player roles.

The characters of *Bang!* and the roles defining the interaction among the players are creative expressions protected by ©.  The side-by-side comparison shows substantial similarity between the characters and roles in *Bang!* and the corresponding characters and roles in *LOTK*.  DaVinci has

stated a claim on which relief can be granted.  Yoka and ZiKo's motion to dismiss the copyright infringement claim is denied.

### C.     The Unfair Competition and Unjust Enrichment Claims

The defendants move to dismiss the Texas Unfair Competition and Unjust Enrichment claims on the basis that they are preempted by the federal Copyright Act.  The Copyright Act preempts:

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.

17 U.S.C. § 301.  A two-part test determines whether federal copyright law preempts a state-law unfair competition claim.  *See Daboub v. Gibbons*, 42 F.3d 285, 288–89 (5th Cir. 1995).  First, the court examines whether the claim falls within the subject matter of copyright, as defined by 17 U.S.C. § 102.  The cause of action is then examined "to determine if it protects rights that are 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106," which gives copyright owners the exclusive right to authorize reproduction, adaptation, publication, performance, and display of their copyrighted works.  *Id.*  "The second condition requires a comparison of the nature of the rights protected under federal copyright law with the nature of the state rights for which the plaintiff seeks protection." *Sefton v. Jew*, 201 F. Supp. 2d 730, 745 (W.D. Tex. 2001) (citing *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 (5th Cir. 1999)).  If the defendants' alleged acts would violate both state law and federal copyright law, then the state-law right is deemed "equivalent to copyright."  *Id.*  If, however, the plaintiff has alleged facts corresponding to an "extra element" that would make the claims "different in kind from a copyright infringement claim," such as a breach of fiduciary duty claim, then his state-law claims are not

preempted.  *Id.*; *Daboub*, 42 F.3d at 289.

DaVinci's unfair competition and unjust enrichment claims are based on its federal copyright infringement claim.  (*See* Compl. ¶¶ 95–101).  There is only "one set of operative facts" and DaVinci has not alleged conduct that separates the state unfair competition claim from the federal copyright infringement claim.  *See Sefton*, 201 F. Supp. 2d at 746.  The unfair competition and unjust enrichment claims are preempted by federal law and are dismissed.

### D.    The Motion for Preliminary Injunction

DaVinci moved for a preliminary injunction under Federal Rule of Civil Procedure 65 and 17 U.S.C. § 502, which would restrain and enjoin ZiKo, Yoka, "and all persons in active concert or participation with them who receive actual notice of such order, from: (1) marketing, promoting, selling and/or distributing any copies of the Infringing Work, including online sales; (2) otherwise infringing DaVinci's copyrights."  (Docket Entry No. 2 at 1–2).  DaVinci must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 163 (5th Cir. 1993).

To demonstrate a substantial likelihood of success on the merits, the movant does not have to prove it is entitled to summary judgment.  *Byrum*, 566 F.3d at 446.  But, as the Fifth Circuit has "cautioned repeatedly," a preliminary injunction is an "extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."  *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir.

2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir.

2003)).  A party may defeat a motion to dismiss without demonstrating a substantial likelihood of

success on the merits.  *See Broadwell v. Municipality of San Juan*, 312 F. Supp. 2d 132, 137 (D.P.R.

2004) ("[T]he standard plaintiffs must surpass in order to succeed on their preliminary injunction

claim, likelihood of success on the merits, is higher than the one they must surpass to defeat

defendants' motion to dismiss.") (citing *Quiles Rodriguez v. Calderon*, 172 F. Supp. 2d 334, 339

(D.P.R.2001)).

　　　　While there are  many similarities between the two games, and some of those similarities are

in protectable elements, the artistic differences are significant enough that a jury could reasonably

find that the works are not substantially similar.  DaVinci has not clearly carried the burden of

persuasion on the first requirement for a preliminary injunction.  Its motion for preliminary

injunction is denied on the current record.

## IV.　　Conclusion

　　　　The motion to dismiss is denied with respect to the copyright claim and granted with respect

to the unfair competition and unjust enrichment claims.  The motion for preliminary injunction is

denied based on the current record.  A status and scheduling conference on the copyright claim is

set for **September 5, 2014**, at 5:00 p.m. in Courtroom 11-B.

　　　　SIGNED on August 8, 2014, at Houston, Texas.

Lee H. Rosenthal

United States District Judge