United States District Court
Southern District of Texas

**ENTERED**

April 27, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DaVINCI EDITRICE S.R.L., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-3415 |
| | § | |
| ZIKO GAMES, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

## I.     Introduction

The plaintiff, DaVinci Editrice S.R.L., sued Yoka Games and its United States distributor,

ZiKo Games, LLC, alleging that Yoka's card game, *Legends of the Three Kingdoms* ("*LOTK*"),

copied protected features of DaVinci's card game, *Bang!* DaVinci asserted claims against Yoka and

ZiKo under the Copyright Act of 1976 and Texas unfair competition law.

An earlier opinion granting in part and denying in part ZiKo and Yoka's motion to dismiss

found that the method of play and rules common to the two card games did not support DaVinci's

copyright-infringement claim, but that the roles and characters in *Bang!*, and their interactions, could

support an infringement claim.  DaVinci has now moved for summary judgment that the roles and

characters in *Bang!* and their interactions are substantially similar to the corresponding components

of *LOTK*.  ZiKo and Yoka cross-moved for summary judgment that these components are not

substantially similar and therefore do not infringe.  The parties responded and replied to the motions.

(Docket Entries No. 59, 61, 64, 65, 66, 70).  ZiKo and Yoka also moved to exclude a declaration that

DaVinci submitted in support of its motion, and DaVinci responded.  The declaration was by Conrad

Hubbard, who testified about his extensive experience playing and developing role-playing games. (Docket Entries No. 69, 71).

Based on the pleadings, the motions and responses, the parties' submissions, the record, and the applicable law, the court grants ZiKo and Yoka's motion to exclude, denies DaVinci's motion for summary judgment, and grants ZiKo and Yoka's cross-motion for summary judgment. The reasons for these rulings are explained in detail below.

## II.    Background

### A.    The Summary Judgment Evidence

Except for Hubbard's declaration, the summary judgment evidence is undisputed. DaVinci's evidence includes the following:

- the declaration of Dr. Ing. Roberto Corbelli, DaVinci's CEO, giving background on the development of *Bang!*, describing in detail *Bang!'s* game rules, and comparing those rules to *LOTK's* rules;

- excerpts from the deposition of Hung Kai, *LOTK's* developer, showing Yoka's access to *Bang!*, that *Bang!* inspired *LOTK*, and that the games are similar; and

- a chart comparing the roles and characters of *Bang!* and *LOTK*.

ZiKo and Yoka's evidence includes the following:

- the instructions of *Bang!* and *LOTK*;

- excerpts from Hung Kai's deposition, clarifying Yoka's access to *Bang!* and the extent to which *Bang!* inspired *LOTK*; and

- the declaration of John Paul Oleksiuk, counsel for ZiKo and Yoka, providing side-by-side comparisons of the cards in the games.

**B.**     **DaVinci and *Bang!***

DaVinci is an Italian company formed in 2001.  (Docket Entry No. 59, Corbelli Decl. at ¶ 2).  On July 10, 2002, DaVinci published *Bang!*, a role-playing card game using wild-West themes. (*Id.* at ¶ 3).  The game received critical praise and commercial success.  It won the awards for the "Best Traditional Card Game of 2003" and the "Best Graphic Design of a Card Game or Expansion of 2003."  (*Id.* at ¶ 4).  DaVinci has sold over 670,000 copies of *Bang!*, including an estimated 176,000 copies in the United States.  (*Id.* at ¶ 6).

Players in *Bang!* each draw a card that assigns one of four roles:  "Sheriff," "Deputy," "Outlaw," or "Renegade."  Only one player may be the Sheriff or the Renegade, while the number of Outlaws and Deputies varies with the total number of players in each game.  (*Id.* at ¶¶ 14-20). Each role is assigned a different winning condition.  (*Id.*).  The Sheriff wins if he stays alive until the Outlaws and the Renegade are killed.  (*Id.* at ¶ 15).  The Deputies try to protect the Sheriff.  (*Id.* at ¶ 16).  The Outlaws win if the Sheriff is killed, though they can also earn rewards for killing each other.  (*Id.* at ¶ 17).  The Renegade wins if he is the last player alive.  (*Id.* at ¶ 18).  The Sheriff reveals his role at the outset; the other players keep their assigned roles secret.  (*Id.* at ¶ 19).

Each player also gets a card assigning a particular character.  These character cards have pictures and names based on familiar wild-West figures, such as "Calamity Janet" and "Willy the Kid."  Character assignment is separate from role assignment.  Any character can be assigned to any role.  Calamity Janet may be the Sheriff in one game, for example, and an Outlaw in another game.

Each character has an assigned set of abilities and a maximum number of "life points."  (*Id.* at ¶ 22).  A character's assigned ability set usually alters a generally applicable rule of player action. For example, "Slab the Killer" has the ability to mount attacks that are more difficult to block than

under the usual rules.  (Docket Entry No. 59, Ex. H at 3).  "Rose Dolan" has the ability to  attack players from longer distances than usual.  (*Id.*; Docket Entry No. 59, Ex. 6 at 110:6-13, 126:10-18).

The back of each character card shows a certain number of bullets, one for each life point. No character has more than five life points.  The number of life points determines whether and for how long a player remains alive as the game progresses.  (Docket Entry No. 9, Corbelli Decl. at ¶ 24).  The character cards do not identify the character's back story or personality.

Each player is also dealt a weapon card.  When a player uses a weapon card to "hit" another player, the attacked player loses a life point.  (*Id.* at ¶¶ 34-35).  When a player is out of life points, that player is eliminated from the game.  (*Id.* at ¶ 44).  Each player keeps track of how many life points remain.

The character card is turned face down to show the number of bullets.  As the game progresses, the player moves the character card so that only the number of remaining bullets shows. The number of bullets a player has left also determines how many cards the player may hold in his hand.  For example, if a player has two bullets remaining, that player may hold only two cards.  If the player has more than two, all but two must be discarded.  (*Id.* at ¶¶ 24-25, 35-36).

The players sit around a table.  The distance between the players affects the game, because different weapons have different ranges at which they can be used to attack other players.  (*Id.* at ¶¶ 26-28, 34).

The Sheriff plays first, and the game proceeds counterclockwise around the table.  Each player draws two cards, plays as many cards as desired for that turn, and discards any unplayed cards if the player's turn ends with more cards than life points.  (*Id.* at ¶ 36).

There are several types of action cards as well.  A blue-bordered weapon card is laid face-up

in front of the player and remains until another weapon card replaces it.  (*Id*. at ¶ 37).  Blue-bordered mount cards increase the distance between players needed to launch or avoid an attack.  Blue-bordered mount cards have Western themes consistent with the overall game appearance, including "Jail," "Dynamite," "Barrel," "Horse," and "Appaloosa."  (Docket Entry No. 59, Corbelli Decl. at ¶¶ 37-42).  A mount card has lasting effect, which means that the player holding the card can take advantage of what the card grants each time that player has a turn.  (*Id*. at ¶ 37).  For example, playing the "Cavallo" ("Horse") mount card increases the distance other players need to hit the player holding that card.  (*Id*. at ¶¶ 39-40).

The weapons cards also evoke the wild West, with the Colt .45 gun as the default weapon. Other weapons include the Remington, Schofield, Rev. Carabine, and Winchester guns.  (*Id*. at ¶ 34).

The brown-bordered action cards include "Bang!" cards, which reduce another player's bullets; "Mancato!" or "Missed!" cards, which are played in response to a "Bang!" card to avoid losing a bullet; and "Birra" or "Beer" cards, which a player can use to avoid elimination.  (*Id*. at ¶¶ 35, 38).  The brown-bordered cards fit the wild-West motif, with labels such as "Saloon," "Diligenza" or "Stagecoach," "Wells Fargo," "Mistress," "Indiani!" or "Injuns!," and "Duello" or "Duel."  Each card calls for a specific player action, such as discarding a type of card, revealing the cards in the player's hand, or passing a card to another player.  (*Id*. at ¶¶ 35, 38; Docket Entry No. 59, Ex. H at 5-10).

The game ends when playing the action cards leads to either killing the Sheriff, so that either the Renegade or the Outlaws win, or killing the Outlaws and the Renegade, so that the Sheriff and his Deputies win.  (*Id*. at ¶ 49).

C.    Yoka, ZiKo, and *Legend of the Three Kingdoms*

Yoka is based in the People's Republic of China.  Its United States distributor, ZiKo, is incorporated and based in Texas.  The parties agree that *Bang!* and *LOTK* have nearly identical rules.  The settings—the wild West and ancient China—and accompanying artwork and written instructions are substantially different.  The ancient-China-themed roles in *LOTK* are the Monarch, his Minister, the Rebels, and the Turncoat.  They have the same functions and goals as the Sheriff, Deputies, Outlaws, and Renegade in *Bang!*  (*Id.* at ¶ 51).  "The winning conditions are the same" in both games.  (*Id.* at ¶ 52).  As with the Sheriff in *Bang!*, "[o]nly the Monarch's identity is known to the other players."  (*Id.* at ¶ 53).

The procedure for assigning the Ministers, Rebels, and the Turncoat in *LOTK* follows "the same manner as in *Bang!* based on the number of players."  (*Id.* at ¶ 54).  In both games, "each player is dealt a character identity . . . which provides a specific ability and determines the number of life points for the player."  (*Id.* at ¶ 55).  "As [with the Sheriff ] in *Bang!*, the Monarch starts the game with one more life point than shown on his character card."  (*Id.*).  Life points are displayed on cards in both games*, id.* at ¶ 56, but instead of showing them as bullets, *LOTK* shows them as glowing, Yin-Yang shaped symbols.  Both games show the life points on cards, but *Bang!* places them on the back of character cards, while *LOTK* has separate life-point cards.  (Docket Entry No. 61, Ex. 8 at 1).

*LOTK* features "Hero cards" that are the functional equivalent of the *Bang!* character card. *LOTK* characters "Lu Bu," "Zhao Yun," "Ma Chao," "Zhou Yu," "Zhang Fei," "Zhang Liao," and "Huang Gai" have many of the same abilities and number of life points as the *Bang!* characters "Slab the Killer," "Calamity Janet," "Rose Doolan," "Pixie Pete," "Willy the Kid," "Jesse Jones,"

and "Chuck Wengam." (Docket Entry No. 59, Ex. H at 3-5). Although the *LOTK* characters have many of the same special abilities and life points as the *Bang!* characters, they have different names and appearances. Instead of the wild-West, the characters evoke themes of ancient China. (Docket Entry No. 61, Olesksiuk Decl. at ¶¶ 3-12).

Action cards in *LOTK* operate the same way as the various action cards in *Bang!*, using words and artwork reflecting ancient China rather than the wild West. "Strike cards operate the same way as a Bang! card. Peach cards operate the same way as Beer [*Birra*] cards. Dodge! cards operate identically to Missed! [*Mancato!*] cards." (Docket Entry No. 59, Corbelli Decl. at ¶ 60). "Basic cards operate the same way as *Bang!*'s brown bordered cards. Scroll cards operate as the blue bordered cards. Equipment and Weapon cards operate the same way as the Weapon cards in *Bang!*." (*Id.* at ¶ 61.).

Both *Bang!* and *LOTK* are turn-based card games in which the players' roles are not revealed, except for the Sheriff and Monarch. Both games have identical mechanisms and rules for one player to attack others and to defend against attack. Each successful attack reduces the attacked player's life points.

The physical positions of the players around a table are the same for both games. The Monarch, Minister, Rebel, and Turncoat roles in *LOTK* correspond to the Sheriff, Deputy, Outlaw, and Renegade roles in *Bang!*; they are functionally the same and are subject to the same rules. The only differences are the theme and related character names and appearance.

The rules of play are nearly identical. Both games use action cards, which are laid face-up in front of the players and apply throughout the game. Both games use mount cards, a type of action card that increases the distance between players for launching and avoiding attack. Weapon cards

7

are common to both games and allow players to attack one another at a specified range based on a certain type of weapon.  Both games end when either the Sheriff or Monarch is killed, or when the Outlaws and Renegades or Rebels and Turncoats are killed.

### D.    Procedural Background

DaVinci asserted claims of copyright infringement, unfair competition, and unjust enrichment against ZiKo and Yoka and requested a preliminary and permanent injunction preventing them from selling *LOTK* in the United States.  ZiKo and Yoka moved to dismiss, (Docket Entry No. 25), and the court held a hearing on the motion and on DaVinci's request for a preliminary injunction, (Docket Entry No. 39).  On August 8, 2014, the court granted in part and denied in part the motion to dismiss and denied the request for a preliminary injunction.  (Docket Entry No. 44). The court ruled that DaVinci's infringement claim could not be based on "alleged similarities between the rules of play of the two games.  The similar uses of life points, distance between players, action cards, and rewards and punishments do not constitute actionable copying."  (*Id.* at 15).  The court held that "*Bang!* characters are derived from wild-West models but are original expressions, including their visual characteristics and their capabilities within the game.  Given the similarities between the attributes of the characters in *Bang!* and in *LOTK*, a reasonable factfinder could conclude that the characters of the two games are substantially similar despite the transposition and translation from the wild-West theme of *Bang!* to the ancient China theme of *LOTK*."  (*Id.* at 19).  The court also held that "the characteristics and manner in which the characters interact, not merely the names and pictures used to depict them, are creative and expressive elements in a role-playing game and are protectable."  (*Id.* at 21-22).  The court nonetheless denied DaVinci's request for a preliminary injunction because "[w]hile there are  many similarities between the two

games, and some of those similarities are in protectable elements, the artistic differences are significant enough that a jury could reasonably find that the works are not substantially similar." (*Id.* at 25).  The court dismissed DaVinci's unfair competition claims because federal copyright law preempted them.  (*Id.* at 22-23).

Discovery followed.  Besides an admission by *LOTK*'s creators that they had access to *Bang!* and that it inspired *LOTK*, little has changed since the court ruled on the motion to dismiss and the request for a preliminary injunction.  Discovery has confirmed DaVinci's factual allegations about the games' similarities, which are undisputed.  The parties do dispute the legal effect of those similarities but agree that the case is appropriate for resolution on cross-motions for summary judgment.

ZiKo and Yoka argue that the interactions of the roles and characters in *Bang!* are not substantially similar to the corresponding roles, characters, and interactions in *LOTK*.  ZiKo and Yoka characterize the interactions between the characters and roles in *Bang!* as little more than rules and procedures unprotected by copyright.  ZiKo and Yoka point out that the only character aspects from *Bang!* copied in *LOTK* are the special abilities and the number of life points.  ZiKo and Yoka also argue that these special abilities are little more than unprotected game-play rules, and that the the visual depictions and names are not substantially similar.  That argument effectively asks the court to reconsider whether the characters, roles, and their interactions in *Bang!* are expressive content that is incorporated into the corresponding features of *LOTK*.

### III.   The Motion to Exclude

In support of its motion for summary judgment, DaVinci submitted the declaration of Conrad Hubbard, who has extensive experience as a player and a creator of role-playing games.  His

declaration addresses the similarities between *Bang!* and *LOTK*.  (Docket Entry No. 65, Ex. 6).
ZiKo and Yoka moved to exclude Hubbard's declaration, arguing that he is testifying as an expert
under Federal Rule of Evidence 702, but was not disclosed as an expert witness.  DaVinci did not
disclose Hubbard as an expert witness, but did disclose him as a person with relevant information.
(Docket Entry No. 71, Ex. A).  DaVinci argues that Hubbard is a lay witness and that his opinion
testimony is relevant and helpful.  ZiKo and Yoka argue that to the extent he is testifying as a lay
witness, his declaration should be excluded because it is not relevant to a disputed fact.

Hubbard's declaration consists of his impression of the similarities between *Bang!* and
*LOTK* as a frequent player and creator of role-playing games.  (Docket Entry No. 65, Ex. 6).
DaVinci admits in its response that the purpose of Hubbard's declaration is to show that the works
are substantially similar.  (Docket Entry No. 71 at 5-6).  Judgments about the substantial similarities
of two works are not the proper subject of lay-witness testimony.  *See Positive Black Talk Inc. v.
Cash Money Records, Inc.*, 394 F.3d 357, 378 (5th Cir. 2004), *abrogated on other grounds, Reed
Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  In *Positive Black Talk*, the district court excluded
newspaper articles that commented on the similarity of an allegedly infringing rap song.  *Id.*  The
plaintiffs sought to admit the articles "to show that numerous members of the intended audience
believed that the two songs were substantially similar."  *Id.*  The Fifth Circuit held that the district
court did not err in excluding the articles because "the question of substantial similarity is typically
left to the fact finders' own impressions.  Thus, a court could reasonably conclude that the views of
persons not on the jury and not qualified to give an expert opinion on substantial similarity should
not be admitted."  *Id.* at 379.

Assuming that Hubbard's declaration is properly brought as lay-witness testimony, it is not

relevant or helpful.  In *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, the plaintiff alleged that a design for a dog constructed of Mardi Gras beads infringed on its own similar design.  783 F.3d 527, 552 (5th Cir. 2015).  The plaintiff argued that the district court had erred in granting summary judgment against it because declarations or affidavits from customers stating that they had been confused by similarities between the two designs created a fact issue.  *Id.*  The Fifth Circuit rejected this argument, holding that "any confusion by [plaintiff's] customers would have stemmed from a comparison of the two bead dog designs in their entirety, and would therefore have been based largely on unprotectable elements.  Given that the substantial similarity analysis requires a focus on protectable elements, [plaintiff's] evidence of confusion does not raise a genuine issue for trial." *Id.* at 553.  Like the declarations from customers in *Nola Spice*, Hubbard's declaration is that of a third party offering impressions of a work as a whole, when that work is only partly protected.  His testimony is not relevant or helpful and is excluded.  *See also Positive Black Talk*, 783 F.3d at 553.

Even if Hubbard's declaration was admitted, it would not change the result in this case. Hubbard supported his conclusion that the games are substantially similar by comparing the importance of *Bang!* character aspects that were not copied—the names and visual depictions—with those parts that were—the special abilities and life points.  Hubbard stated that character names and visual depictions add little to a role-playing game, while special abilities and life points are more important because of their effect on game play and the overall game experience.

The fact that special abilities and life points might have a significant effect on game play does not make *Bang!* and *LOTK* more similar for purposes of copyright protection, because, as discussed below, game play is not protectable expression.  To the extent Hubbard suggests that the special abilities and life points enhance character interaction, he has not explained how the special

abilities in *Bang!* create expressive character interaction.  The effect of a character's special abilities and life points on a player's experience is not helpful because copyright does not protect game rules, procedures, or winning conditions that create the environment for the expressive elements of the game.  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 846 (2d Cir. 1997); Bruce E. Boyden, *Games and Other Uncopyrightable Systems*, 18 GEO. MASON L. REV. 439, 466 (2011). The remainder of Hubbard's declaration consists of conclusory assertions about the games' similarities. They would be given little weight even if accepted and would not change the outcome.

## IV.     The Applicable Legal Standards

### A.     Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.*

(quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, the movant does not need to negate the elements of the nonmovant's case.  *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'"  *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *EEOC*, 773 F.3d at 694.

### B.  Copyright Protection for Games

Section 102(a) of the Copyright Act provides copyright protection to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which

they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102.  Section 102(b) explicitly limits this protection.  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  *Id.*

"To prove copyright infringement[,] a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'"  *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quoting *Positive Black Talk*, 394 F.3d at 367).  "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."  *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004).  "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  *Id.* at 142 (citation omitted).

"[N]ot all copying is legally actionable.  To support a claim for copyright infringement, the copy must bear a substantial similarity to the protected aspects of the original."[1]  *Peel & Co. v. The Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001).  "[W]here the copyrighted work contains unprotectable elements, the first step is to distinguish between protectable and unprotectable elements of the copyrighted work."  *Nola Spice*, 783 F.3d at 550; *see also Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) (a court must "determine the scope of copyright protection before works are considered as a whole." (citations ommited)); *Atari, Inc. v. N. Am.*

---

[1]  A party must also show that the alleged infringer had access to the work.  *Gen. Universal Sys., Inc.*, 379 F.3d at 141.  The parties do not dispute that Yoka had access to *Bang!*.

*Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982) ("While dissection is generally disfavored, the ordinary observer test, in application, must take into account that the copyright laws preclude appropriation of only those elements of the work that are protected by the copyright.").

Copyright law does not protect an idea; only its expression is protected. *Nola Spice*, 783 F.3d at 551. A party claiming infringement may place "'no reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Comput.*, 35 F.3d at 1446 (quoting *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)). Copyright does not protect game rules because they fall within the section 102(b) exceptions for an "idea, procedure, process, system, method of operation." *See, e.g.*, *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005) ("[T]he Copyright Act provides that copyright protection does not extend to any "method of operation . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." (quoting § 102(b))); *Whist Club v. Foster*, 42 F.2d 782, 782 (S.D.N.Y. 1929) ("In the conventional laws or rules of a game, as distinguished from the forms or modes of expression in which they may be state[d], there can be no literary property susceptible of copyright."); MELVILLE B. & DAVID NIMMER, NIMMER ON COPYRIGHT § 2.18[H][3] (2010) ("[N]o copyright may be obtained in the system or manner of playing a game or engaging in any other sporting or like activity.").

"[G]ame mechanics and the rules are not entitled to protection, but courts have found expressive elements copyrightable, including game labels, design of game boards, playing cards and graphical works." *Tetris Holding, LLC v. Xio Interactive, Inc.*, 863 F. Supp. 2d 394, 404 (D. N.J. 2012) (citations omitted); *see also Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) ("[C]opyright protection extends only to the artistic aspects, but not the mechanical or

utilitarian features, of a protected work.").  Unlike a book or movie plot, the rules and procedures, including the winning conditions, that make up a card-game system of play do not themselves produce the artistic or literary content that is the hallmark of protectable expression.  *See* Boyden, 18 GEO. MASON L. REV. at 466.  Instead, the game rules, procedures, and winning conditions create the environment for expression.  *Id.*; *see also Nat'l Basketball Ass'n*, 105 F.3d at 846 ("Unlike movies, plays, television programs, or operas, athletic events are competitive and have no underlying script.").

This general rule is consistent with the decision in *Baker v. Selden*, 101 U.S. 99 (1879), in which the Supreme Court ruled that a particular bookkeeping system was not copyrightable.  The language and illustrations that the plaintiff had used to explain his system were copyrightable, but they did not protect the system itself from use by other parties.  The Copyright Office has applied the rule that copyright does not protect a system's operation method to games.  The December 2011 fact sheet for Copyright Registration of Games states:

> Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it.  Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game.  Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles.  Copyright protects only the particular manner of an author's expression in literary, artistic, or musical form.

U.S. COPYRIGHT OFFICE, FL-108, COPYRIGHT REGISTRATION OF GAMES (2011).

In *Chamberlain v. Uris Sales Corporation*, 56 F. Supp. 987 (S.D.N.Y. 1944), the court held that the plaintiff could not rely on copyright protection for the rules of the game "Acy-Ducy," a four-player variation of backgammon.  The court found that the plaintiff's game lacked the originality

necessary for copyright protection, noting that "it is very doubtful if rules of a game can, in any event, be copyrightable subject matter." *Id.* at 988 (citations omitted). In *Freedman v. Grolier Enters.*, *Inc.*, 1973 WL 19914 (S.D.N.Y. June 30, 1973), the court held that "[t]he placing of single numeral point count values beneath the suit symbols on honor cards in bridge decks [was] not copyrightable." *Id.* at *2. "[W]hen an idea is so restrictive that it necessarily requires a particular form of expression, that is, when the idea and its expression are functionally inseparable, to permit the copyrighting of the expression would be to grant the copyright owner a monopoly of the idea." *Id.* at *3.

Courts that have found infringement of a game generally focus on the visual appearance used in the game or on expressive aspects of the game's characters. *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 610 (7th Cir. 1982), for example, involved a copyright claim for the popular PAC-MAN game. PAC-MAN centered on a "gobbler" character eating dots as it progressed through a maze while avoiding "ghost monsters." The allegedly infringing game was essentially the same. The court held that the PAC-MAN game play—a character eating its way through dots in a maze while being chased—was not protectable. *Id.* at 617. But the court did find the characters' appearances and names protectable, because they were uniquely designed, fanciful, and "without reference to the real world." *Id.* at 617-18.

## C.    Analysis

Although the themes of *Bang!* and *LOTK* are quite different, the parties do not dispute that their rules and operation are similar. The parties also agree that the rules, procedures, and limits that make up the game play are not protectable expression, and that the visual depictions and descriptions of the characters and theme-related elements of *Bang!* and *LOTK* are not substantially similar. The

17

parties' dispute comes down to a particular aspect of *Bang!* that is at the intersection of unprotectable game play and protectable expressive content:  the roles and characters and their interactions.

ZiKo and Yoka argue that the interactions between the Sheriff, Deputies, Outlaws, and Renegade are only rules of game play, or in the alternative, that the interactions are so generic and unoriginal as to be unprotected.  Their argument is similar to that presented in *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012).  The plaintiff video-game producer alleged that the defendants' game, *Yeti Town*, infringed on the plaintiff's game, *Triple Town*.  The objective in both games was to score points by developing a city through a process of matching three game pieces together.  Each game took place in a six-by-six grid.  A player placed three objects in connected squares of the grid to create a new object that advanced the player one step up in the game hierarchy.  In *Triple Town*, three units of grass combined to form a bush, three bushes made a tree, three trees made a hut, and so on.  *Yeti Town* followed the same progression, but used saplings, trees, tents, and cabins as the corresponding objects.  Both games included dialogue boxes that explained game concepts.  These boxes used similar, but not identical, phrases.  Both games included antagonistic characters that slowed the players' progress.  In *Triple Town*, the antagonist was a bear; in *Yeti Town*, the antagonist was a yeti.  *Id.* at *1.

The court in *Spry Fox* acknowledged that "the rules of the game are entitled to (at best) thin protection."  *Id.* at *6.  The court, however, held that the game-play element of  "object hierarchy that progresse[d] from grass to bushes to trees to houses and beyond" was a copyrightable element of expression.  *Id.*  The court analogized the progression of events in a game to the plot of a book, explaining that "[a] video game, much like a screenplay expressed in a film, also has elements of

18

plot, theme, dialogue, mood, setting, pace, and character[,] . . .[and a] writer who appropriates the plot of *Gone with the Wind* cannot avoid copyright infringement by naming its male protagonist 'Brett Cutler' and making him an Alaskan gold miner instead of a southern gentleman." *Id.* at *5-6. "Spry Fox took the idea underlying *Triple Town* and expressed it with its own characters, its own setting, and more[,]" which were protectable. *Id.*

Like the *Spry Fox* court, this court agrees that certain games can have a progression of events and a roster of developed characters that make the game expressive, just as the progression of a book or movie plot can be expressive even when the basic elements are common. Many video games, for example, involve lead characters in fictional worlds who embark on a quest to achieve a specific goal, such as saving a princess or avenging a wrong. This lead character progresses down a predictable or even predetermined path and interacts with a series of characters along the way. Many of the characters have back stories and personalities. An example of this type of game is the *Legend of Zelda* series. *See* NINTENDO, THE LEGEND OF ZELDA: HYRULE HISTORIA 68-135 (Patrick Thorpe ed., 2013) (explaining the cannon of the *Legend of Zelda* series). But other games have plot progressions and characters who interact in ways that fall short of the expressive character interactions and plot progressions that are protected by copyright law. The game of basketball, for example, is not protected by copyright. *Nat'l Basketball Ass'n*, 105 F.3d at 847. Basketball has a loosely prescribed progression: teams trade offensive possessions over four quarters of play. Players have assigned roles, such as guard, forward, or center, and in those roles interact with each other. But "[u]nlike movies, plays, television programs, or operas, [basketball games] are competitive and have no underlying script." *Id.*

*Bang!* is in this second category. In *Bang!*, the Sheriff and Deputies are pitted against the

19

Outlaws and the Renegade.  Other than these alignments, the events in a *Bang!* game are not predetermined because the interactions between the roles have no underlying script or detail and are not fixed.  Making certain roles aligned and others opposed is part of the game's winning conditions, but these determine little about how players will progress through the game.  *See* Boyden, 18 GEO. MASON L. REV. at 466 (copyright does not protect systems that set the stage for expression to occur). Like basketball, *Bang!* has created a number of roles, defined their alignment with and opposition to other roles, and created rules for their interaction, but has not created a scripted or detailed performance for each game.  Using *Spry Fox's* example of *Gone with the Wind*, *Bang!* identifies characters analogous to Scarlett O'Hara's two romantic interests, Ashley Wilkes and Rhett Butler, giving them names and appearances consistent with their setting.  Unlike *Gone with the Wind*, however, *Bang!* has no specific plot or detailed information about the characters that tells us what these characters will do or how they will interact with other characters.

*LOTK's* alignment of roles tracks *Bang!'s*, which in turn was drawn from the general alignment of stock characters in "spaghetti Westerns."  *See Gaiman v. McFarlane*, 360 F.3d 644, 659–60 (7th Cir. 2004) (stock characters are not protectable by copyright); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1176 (9th Cir. 2003) (same); *Williams*, 84 F.3d at 588; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (same).  A cursory review of the spaghetti-Western genre shows sheriffs and deputies, the "good guys," joining forces against outlaws and renegades, the "bad guys." These are stock roles.  But the appearances and names of the characters of *Bang!*, as opposed to the roles themselves, contain expressive qualities, as does the setting.  Each *Bang!* character has a distinctive name and associated color scheme and visual depiction that match *Bang!'s* wild-West setting.  The parties agree that these elements of *Bang!* and *LOTK* are dissimilar.  The common link

between *Bang!* and *LOTK* characters is each character's set of abilities and number of life points.

The court previously found that the depiction and description of each character's abilities in *Bang!* were analogous to those found protectable in *Capcom U.S.A., Inc. v. Data E. Corp.*, No. C 93-3259 WHO, 1994 WL 1751482, at *1 (N.D. Cal. Mar. 16, 1994), and distinct from those found unprotectable in that case. Ziko and Yoka argue that this analysis and conclusion deserves reexamination.

In *Capcom*, the plaintiff alleged that the defendant's *Fighter's History* video game infringed its own game, *Street Fighter II*. Both games involved one-on-one karate fights between a series of characters. *Capcom*, 1994 WL 1751482, at *2. Many of the characters in *Fighter's History* physically resembled the characters in *Street Fighter II*. *Id.* at 15-20. The characters shared stock fighting moves, such as kicks and punches, as well as more fanciful moves, such as throwing magical projectiles. *Id.* at 12. In both games, the characters' health was quantified and tracked, with combat ending when a character lost all of his or her health. *Id.* at 2, 8.

In determining whether the two games were substantially similar, the court first eliminated those game characteristics that were not entitled to protection. The court noted that tracking the quality that keeps a player in the game—in *Street Fighter II* health, and here, life points—was common and not entitled to protection. *Id.* at *8. The court also noted that the stock moves, such as kicks and punches, were not protectable because they were "unoriginal . . . and contain[ed] little or no expressive detail above the basic idea that they represent." *Id.* at *12. The court did find that some characters' fanciful special moves were protected expression. For example, the *Street Fighter II* character "E. Honda" and the *Fighter's History* character "Jean" both slapped opponents repeatedly at a humanly impossible speed. This move was expressive because its design was limited

only by the game developer's imagination.  *Id.* at *20.  But the court also found no substantial similarity for two characters who had similar appearances and a similar fanciful move—throwing a magical projectile—because the projectiles looked different and were not original to the plaintiff. *Id.* at *15-16.

The character content found protectable in *Capcom* is distinguishable from the character content in *Bang!*  The *Bang!* characters' abilities are largely drawn from stock-character abilities. Like a punch or kick in a karate game, *Bang!* characters' abilities are common in games in which the object is to kill the other players, such as enhanced attack ranges and strength.  These abilities are neither original to DaVinci nor as imaginative as the moves found protectable in *Capcom*.  The other similar characteristic between *Bang!* and *LOTK* is the characters' life points. The court in *Capcom* specifically held measures of player viability to be commonplace and not protectable, and this court agrees.  *Id.* at *8.

Even if the *Bang!* characters' abilities were not stock, they are still not expressive because they are essentially rules of game play.  The character of Rose Doolan, for example, has the ability to strike opponents from a longer distance than other characters.  (Docket Entry No. 61, Ex. 6 at 110:6-10).  This ability is no more expressive than the ability of a rook in a chess game to take an opposing piece from all the way across the board, as opposed to a pawn that may attack only from the next square.  The rook's ability affects other characters or roles in the game because the attack range increases the queen's and king's exposure.  But this special ability is neither literary nor artistic.  It is an aspect of game play, a subset of the rules that make up the game system.

Even though the characters' abilities and life points are not protectable elements, they may combine with other character elements to fall under copyright protection.  *Hogan v. DC Comics*, 48

F. Supp. 2d 298, 309-10 (S.D.N.Y. 1999) ("In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." (citations omitted)); *Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd.*, 697 F. Supp. 1136, 1140 (E.D. Cal. 1987) (considering the characters' "developed personalities and particular ways of interacting with one another and their environment.").   But here, the unprotected abilities and life points are the only shared elements in the *Bang!* and *LOTK* characters.   The names and visual depictions of the characters are different, as is the world the characters operate in.   *See Warner Bros. Inc. v. Am. Broad. Companies, Inc.*, 720 F.2d 231, 243 (2d Cir. 1983) (characters' special abilities are  not substantially similar when these abilities are the characters' only common or shared element).

DaVinci argues that because each *Bang!* player is assigned a character and a role, the alignment of the roles combines with the expressive elements of the characters to create protectable expressive content.  This argument fails because any character can be assigned to any role.  In one game, Rose Doolan could be the Sheriff who works with one of the Deputies, Slab the Killer, to kill the Outlaws and Renegade.  In the next game, Rose Doolan may be the Outlaw who must kill Slab the Killer, who is the Sheriff in that game.  The characters' interactions change from game to game. *See Nat'l Basketball Ass'n*, 105 F.3d at 846 (basketball is not protected because the action is not "scripted"); Boyden, 18 GEO. MASON L. REV. at 466 (copyright does not protect systems that set the stage for expression to occur).  The combination of roles and characters also adds little to the overall expressive content of the game, given that the content of the game itself is not fixed.  It is the equivalent of casting actors to roles in a movie that has no detailed script, no specific plot, and no detailed information about the characters.

Learned Hand's explanation of copyright protection in *Nichols v. Universal Pictures Corp.* is instructive.  "If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress."  45 F.2d 119, 121 (2d Cir. 1930).  In Learned Hand's example of noninfringement, the steward is vain and foppish and in love with his mistress.  The roles and characters in *Bang!* and their interactions are far less developed than the steward and mistress in Learned Hand's description.  Assigning a special ability to a *Bang!* character tells us little about how that character interacts with others.  *Bang!* characters do not have delineated personalities, temperaments, back stories, or other features typical of characters in movies and books that contribute to making those characters' interactions protected.  Their feelings about each other are undefined except for the crude boundary set by alignment or opposition.  *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)  ("The less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

The undisputed summary judgment evidence shows that *Bang!'s* characters, roles, and interactions are not substantially similar to those in *LOTK*.  The aspects of the roles, characters, and interactions that are similar are not expressive, and aspects that are expressive are not substantially similar.  ZiKo and Yoka are entitled to summary judgment of noninfringement.

**V.      Conclusion**

The court grants  Ziko and Yoka's motion to exclude, (Docket Entry No. 69), grants their cross motion for summary judgment, (Docket Entry No. 61), and denies DaVinci's motion for summary judgment, (Docket Entry No. 59).  Final judgment is entered by separate order.

SIGNED on April 27, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25